IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 29, 2022 Session

**STATE OF TENNESSEE v. JAVIER C. PEREZ**

**Appeal from the Criminal Court for Washington County**
**No. 43889     Stacy L. Street, Judge**

_____

**No. E2021-00475-CCA-R3-CD**

_____

A Washington County Criminal Court convicted the Appellant, Javier C. Perez, of possessing .5 grams or more of methamphetamine, a Schedule II controlled substance, with the intent to sell, a Class B felony.  See Tenn. Code Ann. § 39-17-434.  The trial court sentenced the Appellant to eight years of incarceration in the Tennessee Department of Correction.  On appeal, the Appellant raises the following issues for review:  (1) whether the evidence was sufficient to sustain his conviction; (2) whether the trial court erred by instructing the jury pursuant to Tennessee Code Annotated section 39-17-419 that they could infer the intent to sell based upon the amount of drugs possessed; (3) whether the trial court erred in denying the Appellant's motion for mistrial after Officer Curtis testified regarding "drug mules"; (4) whether the trial court committed plain error by allowing the State to "vouch against the Appellant's credibility in its closing arguments"; and (5) whether the trial court erred in denying the Appellant's motion for new trial based on newly discovered evidence.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Brian D. Wilson, Franklin, Tennessee (on appeal); and William Francisco, Johnson City, Tennessee (at trial), for the Appellant, Javier C. Perez.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Kenneth Baldwin, District Attorney General; and Justin Irick, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I.  Factual Background

The Washington County Grand Jury indicted the Appellant for possession of .5 grams or more of methamphetamine with the intent to sell.  The charges stemmed from an incident in March 2018 when Officer James Curtis with the Johnson City Police Department went to the Appellant's motel room in response to a 911 call reporting an attempted break-in.  While at the motel room, Officer Curtis searched the Appellant's coat and discovered the drugs.

At trial, Officer Curtis testified that he was working the night shift on March 4, 2018, when he was dispatched to room 202 of the Quality Inn on South Roan Street in Johnson City.  The occupant of the room, who was later identified as the Appellant, had called 911 and reported that someone was trying to break into his room and possibly rob him.  Upon his arrival at the scene, Officer Curtis did not observe any commotion around the room and did not see any damage to the room's door or window.  Officer Curtis, who was wearing a uniform, announced that he was a police officer and knocked on the door several times.  The Appellant "cracked open" the door "then immediately slammed [it] shut."  After Officer Curtis "beat[] on the door a little harder," the Appellant opened the door.

Officer Curtis said that when he "first made contact" with the Appellant, he did not know whether the Appellant was a victim or a suspect in the robbery.  Therefore, the first thing Officer Curtis did was ask if he could pat-down the Appellant.  The Appellant agreed, and Officer Curtis did not find any weapons during the pat-down.  Immediately prior to the pat-down, the Appellant had removed his coat and put it on the bed, which Officer Curtis thought was "a little weird."

Officer Curtis spoke with the Appellant, and the Appellant said that he was the occupant of the room.  The Appellant told Officer Curtis that someone had "beat on the door," that "some kind of scuffle . . . happened inside the room," and that he called 911 after the person left.  Officer Curtis was unable to find evidence to corroborate any of the Appellant's claims.  Officer Curtis asked the Appellant to exit the room, and Officer Curtis quickly searched the room to ensure it was empty.

After the search of the room, Officer Curtis asked if he could search the Appellant's coat, and the Appellant agreed.  In one of the coat pockets, Officer Curtis found a bag containing twenty-three grams, almost an ounce, of methamphetamine.  Officer Curtis asked the Appellant to identify the substance, and the Appellant said it was "[m]eth."  The Appellant agreed that the methamphetamine belonged to him.

Officer Curtis said that he had been an officer for eight years, that he had attended four or five narcotics training classes which lasted forty hours each, and that he was either

associated with or lead officer on "[h]undreds, maybe thousands" of cases involving methamphetamine. Officer Curtis stated that, based upon his training and experience, an individual would not typically possess twenty-three grams of methamphetamine for personal use. He explained that a "heavy user" would, at most, use one or two grams of methamphetamine per day and that a user normally would carry "a half a gram to two grams, depending on how much they use a day." Officer Curtis opined that for a heavy user, twenty-three grams of methamphetamine would be enough for one month and that typically a person in possession of twenty-three grams of methamphetamine was selling or distributing it. Officer Curtis said that the people he met who used methamphetamine frequently also sold methamphetamine. Accordingly, Officer Curtis concluded that the Appellant was selling or distributing the methamphetamine.

Officer Curtis did not find any luggage or personal belongings in the room. He also did not find cash, baggies, scales, drug ledgers, pipes, lighters, straws, syringes, or other paraphernalia on the Appellant or inside the room that would indicate whether the methamphetamine was for sale or personal use. Officer Curtis said that even if he had found paraphernalia for drug use, the large amount of methamphetamine would have led him to believe the Appellant possessed the drugs with the intent to sell. Officer Curtis said that the Quality Inn was "a high drug trafficking area" and that the police would sometimes "be out there every night. Every night we worked."

Officer Curtis estimated that a gram of methamphetamine usually cost eighty dollars and that an "eight ball," or three grams, of methamphetamine usually cost $250 to $300. He estimated that the street value of twenty-three grams of methamphetamine was between $2,000 and $2,300. Officer Curtis asked the Appellant if he was employed. Officer Curtis thought the Appellant said he was employed but could not recall where the Appellant said he worked. Officer Curtis further recalled that the Appellant lived in Johnson City.

On cross-examination, Officer Curtis acknowledged that he did not question the Appellant further after the Appellant admitted the drugs belonged to him and that he called 911. Officer Curtis explained that a narcotics investigator arrived, that the Appellant was advised of his Miranda rights, and that the Appellant "lawyered up." Officer Curtis conceded that the only indicator of a "trafficking operation" was the large amount of drugs. Officer Curtis acknowledged that the Appellant did not have multiple cellular telephones and that the police found no evidence of drug trafficking on the Appellant's cellular telephone.

On redirect examination, Officer Curtis was asked if he were familiar with the term "drug mule." Officer Curtis explained that a "drug mule" was "a transporter" who picked up narcotics from one dealer and delivered them to another dealer, such as from a "high level supplier" to a "street level dealer." In other words, "a drug mule" was a "middle man" who was paid upon delivery, which "constitute[d] a resale of that product." Officer

- 3 -

Curtis surmised that if the Appellant were a middle man, he may have had no cash because the "altercation" at the Quality Inn had interfered with his ability to "drop . . . the dope off," and he had not been paid. Additionally, a middle man would have had no need to divide the drugs into separate bags. On recross-examination, Officer Curtis acknowledged that the Appellant may have spent all of his money buying the methamphetamine.

On further redirect-examination, Officer Curtis conceded that if the Appellant were a middle man, he would have had to communicate with a dealer. Officer Curtis further conceded that the police found no evidence of drug trafficking on the Appellant's cellular telephone. He explained, however, that drug mules usually communicated with dealers "face-to-face" instead of by cellular telephones so nothing could be "traced back" to the dealer.

Alyssa Turin testified that she worked in the forensic chemistry unit of the Tennessee Bureau of Investigation's (TBI) crime laboratory. The trial court allowed Turin to testify as an expert witness. Turin said that she analyzed the substance recovered from the Appellant and determined that it was 21.05 grams of methamphetamine.

Stephanie Ann Bitner testified for the defense. Bitner stated that on March 5, 2018, she was working as a licensed practical nurse (LPN) in the Washington County Detention Center. Bitner said that when the Appellant was admitted as a new inmate after his arrest, she completed a screening form. Bitner had no independent recollection of the Appellant and had to restrict her testimony to the information on the form. Bitner agreed that one of the questions on the form "ask[ed] whether the inmate appeared to be under the influence of any drugs or alcohol or withdrawing from drugs or alcohol" and that "[i]t's marked yes." She also agreed that she "would've obtained that information from [the Appellant] on March 5th." The form reflected that the Appellant told Bitner that he had been using methamphetamine regularly for six months and that he had also been using cocaine.

On cross-examination, Bitner explained that she filled out the form based upon the Appellant's verbal responses. She agreed that the first question on the form asked her to report anything she observed that made her believe the Appellant was under the influence. The response on the form reflected she had observed that the Appellant was "[j]ittery, nervous." She stated that people "coming off" methamphetamine usually looked jittery and nervous; however, she acknowledged that someone who had just been arrested could be nervous and jittery regardless of whether he was under the influence of a narcotic. Bitner conceded that she did not drug test the Appellant.

The Appellant[1] testified that at the time of his arrest, he worked in construction and earned approximately $1,500 per week. The week before his arrest, he had been unable to

_____

[1] The Appellant testified through an interpreter.

work every day because of rain and snow and had started consuming alcohol and drugs. For five days prior to his arrest, the Appellant drank beer and used drugs at his house. After he ran out of drugs, he became "paranoid" around other people and went to the motel. While at the motel, he bought twenty-eight grams of methamphetamine for $500. Afterward, he drank beer and used a "rolled-up" bill to "snort" some of the methamphetamine in his room. The Appellant said that he had been at the motel for only fifteen minutes before the police arrived.

The Appellant acknowledged that he did not open the door for Officer Curtis immediately. He said that he was "paranoid" because he had not slept and had been drinking and using drugs for five days prior to his arrest; therefore, he did not know whether the person knocking on the door was an officer or someone who wanted to attack him.

The Appellant maintained that he bought twenty-eight grams of methamphetamine for personal use. He explained that he had "no problem consuming" three grams or more of methamphetamine as long as he drank alcohol at the same time. On a prior occasion, he almost needed hospitalization because of his drug and alcohol use, and he was "very close" to needing hospitalization on the day of his arrest.

On cross-examination, the Appellant said that he knew the cost of methamphetamine because he had been "using it for a long time" and that Officer Curtis "had no idea . . . about" the street value of methamphetamine. The Appellant said that he bought the methamphetamine "[f]rom a friend," but he refused to disclose the friend's name. The Appellant said that he had planned to use all of the methamphetamine and that he did not want to sell or share the methamphetamine. He explained that he had bought a large quantity of drugs because he was "paranoid" and did not want to have to buy more later. The Appellant checked into the motel using the name of the friend who took him to the motel, but he refused to reveal the friend's name.

The Appellant said that he made a telephone call to arrange to buy the methamphetamine, and he was told to go to the Quality Inn's parking lot. While in the parking lot, he bought twenty-eight grams of methamphetamine. Afterward, the Appellant went to his room and "snorted" three grams using a rolled-up "money bill." The Appellant said that his life would be at risk if he revealed the seller's name. The Appellant asserted that he had never sold methamphetamine. The Appellant stated that he started using methamphetamine a "few years ago when I was diagnosed with a disease that wouldn't allow me to live long." He had not used it previously and "got hooked." The Appellant said that he could use as much as half an ounce of methamphetamine in one day if he were with "a third person," such as a friend or an ex-girlfriend.

The Appellant said that on the night of his arrest, his ex-girlfriend tried to get into his room. He did not open the door because he was "too paranoid" and was "hearing

- 5 -

voices." The Appellant stated that he did not "know how it was that I end[ed] up calling the police. I was [in] such state that I called them knowing that I had the drug."

The State called Officer Curtis as a rebuttal witness. Officer Curtis said that the Appellant's motel room was "[v]ery small" and had one bedroom and an adjoining bathroom. Officer Curtis and the Appellant were "[f]ace to face" when they spoke and when Officer Curtis conducted the pat-down of the Appellant. Officer Curtis did not smell any alcohol on the Appellant and did not see any empty alcohol bottles in the room. Moreover, the Appellant did not say that he had been consuming alcohol.

Officer Curtis said that the Appellant claimed he did not know who was trying to break into his room but that the Appellant gave descriptions of the people. At the time of trial, Officer Curtis did not recall the descriptions, but he knew that no one in the motel's parking lot or on the property matched the descriptions. Officer Curtis knew the Appellant said a man was involved but could not recall if the Appellant said a woman was involved.

Based upon the foregoing proof, the jury found the Appellant guilty of possessing .5 grams or more of methamphetamine with the intent to sell. The trial court sentenced the Appellant to eight years in the Tennessee Department of Correction.

On appeal, the Appellant raises the following issues for review: (1) whether the evidence was sufficient to sustain his conviction; (2) whether the trial court erred by instructing the jury pursuant to Tennessee Code Annotated section 39-17-419 that they could infer the intent to sell based upon the amount of drugs possessed; (3) whether the trial court erred in denying the Appellant's motion for mistrial after Officer Curtis testified regarding "drug mules"; (4) whether the trial court committed plain error by allowing the State to "vouch against the Appellant's credibility in its closing arguments"; and (5) whether the trial court erred in denying the Appellant's motion for new trial based on newly discovered evidence.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant challenges the sufficiency of the evidence sustaining his conviction. On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

- 6 -

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The Appellant was charged with possessing .5 grams or more of methamphetamine with the intent to sell. See Tenn. Code Ann. §§ 39-17-434(a)(3), (e)(1); 39-17-417(c)(1). As our supreme court has stated, "intent can rarely be shown by direct proof and must, necessarily, be shown by circumstantial evidence." Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973). Notably, Tennessee Code Annotated section 39-17-419 provides that "[i]t may be inferred from the amount of a controlled substance . . . , along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Our case law has established "other relevant facts" that may give rise to an inference of intent to sell include the absence of drug paraphernalia, the presence of a large amount of cash, the manner of packaging of the drugs, and the street value of the drugs. See State v. Belew, 348 S.W.3d 186, 191 (Tenn. Crim. App. 2005) (citing State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999)); see also State v. Brown, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (concluding that the absence of drug paraphernalia and the manner of packaging of drugs supported an inference of intent to sell); State v. Matthews, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990) (concluding that testimony concerning the amount and the street value of the drugs was admissible to prove the defendant's intent).

On appeal, the Appellant contends that the State adduced no facts other than the amount of methamphetamine to support the inference that the Appellant possessed the drugs with the intent to sell and that the proof was therefore insufficient to sustain his conviction. In support of this contention, the Appellant cites Belew, in which this court held that a trier of fact may not infer intent based solely on the amount of the controlled substance but must also consider other relevant facts surrounding the arrest. 348 S.W.3d at 191. The State responds that Belew is distinguishable from the instant case because "other relevant facts surrounding the arrest" supported the Appellant's conviction for

possession of .5 grams or more of methamphetamine with the intent to sell. We agree with the State.

In the light most favorable to the State, the proof adduced at trial revealed that after the Appellant called 911 to report that someone was trying to break into his motel room, Officer Curtis went to the room but saw no signs of an attempted break-in. Officer Curtis was wearing his uniform and identified himself as a police officer, but the Appellant initially was reluctant to let the officer into the room. The Appellant eventually allowed Officer Curtis into the room, and Officer Curtis quickly searched the room to ensure no one else was inside. Because Officer Curtis was not sure if the Appellant was a victim or a suspect, he obtained permission to search the Appellant. He found no weapons on the Appellant during a pat-down. However, inside one of the pockets of the coat the Appellant had taken off and put on the bed prior to the pat-down, Officer Curtis found a plastic bag containing a substance that was later confirmed to be 21.05 grams of methamphetamine. The Appellant acknowledged the drugs belonged to him. Officer Curtis said that such a large amount was not typically for personal use only. He explained that a "heavy user" would, at most, use one to two grams of methamphetamine per day and that the amount found in the Appellant's coat indicated that it was for selling or distributing purposes. The police did not find any cash or paraphernalia indicating that the methamphetamine was for personal use during the search. The Appellant had no personal belongings or luggage in the room. Officer Curtis noted that the Quality Inn was in "a high drug trafficking area" and that sometimes the police "would be out there every night." Officer Curtis estimated that a gram of methamphetamine cost eighty dollars, that three grams of methamphetamine usually cost $250 to $300, and that the street value of twenty-three grams of methamphetamine was between $2,000 and $2,300.

The Appellant contends that although no paraphernalia for personal use was discovered, he had snorted methamphetamine using a rolled-up bill and that he was "high" at the time of his arrest, which supported his contention that he possessed the drugs for personal use. The Appellant also notes that although the lack of personal effects in the room supported the State's contention that he possessed the methamphetamine with the intent to sell, it also supported his contention that he was using the methamphetamine. However, these complaints are essentially challenges to the credibility of the State's witnesses and proof. We note that determining the credibility of witnesses is within the purview of the trier of fact. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). The evidence presented by the State was sufficient for the jury to find that the Appellant possessed the drugs with the intent to sell. We may not now reconsider the credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). Although the proof was not overwhelming, the State presented sufficient facts, such as Officer Curtis' testimony regarding the cost of methamphetamine, the amount of methamphetamine used by a typical user, the amount of methamphetamine possessed by

the Appellant, and the lack of drug paraphernalia, to allow the jury to infer that the Appellant possessed .5 grams or more of methamphetamine with the intent to sell.

## B. Jury Instructions

Within the sufficiency of the evidence complaint, the Appellant argues that the proof was insufficient "for the trial court to instruct the jury to infer his intent based on the amount of drugs." Initially, we note that the Appellant did not object to the trial court's instruction regarding the inference,[2] thereby waiving the issue. See Tenn. R. App. P. 36(a); State v. Gilley, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitute[s] waiver of the issue on appeal."). Thus, the Appellant is entitled to relief only in the event of plain error.

Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." See also Tenn. R. Evid. 103(d); State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000); State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks omitted) (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011). This

---

[2] The trial court's instruction mirrored the instruction in the Tennessee pattern jury instructions. See T.P.I.-Crim. 31.04.

court "must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

As we stated earlier, our code provides that "[i]t may be inferred from the amount of a controlled substance . . . , along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Tenn. Code Ann. § 39-17-419. Therefore, the instruction given by the trial court was a correct statement of the law. See State v. Eugene Bernard Cuddy, III, No. E2014-01724-CCA-R3-CD, 2015 WL 7428621, at *8 (Tenn. Crim. App. at Knoxville, Nov. 23, 2015).

The Appellant argues, however, that the facts did not support the instruction because no facts other than the amount of drugs supported the inference. However, as we concluded earlier, other facts supported the inference that the Appellant possessed the methamphetamine with the intent to sell, such as Officer Curtis' testimony regarding the cost of methamphetamine, the amount of methamphetamine used by a typical user, the amount of methamphetamine possessed by the Appellant, and the lack of drug paraphernalia. Therefore, the jury instruction was warranted. We conclude that the Appellant is not entitled to plain error relief.

C. Motion for Mistrial

The Appellant contends that the trial court should have granted his motion for a mistrial after Officer Curtis testified about "drug mules" and speculated that likely was the Appellant's role. The Appellant maintains that the officer's testimony "went beyond the scope of the indictment and was so unfairly prejudicial that it affected the outcome of the trial." The Appellant also contends that Officer Curtis' testimony regarding drug mules and "middle men" related to the delivery of drugs, not a sale, which created a fatal variance in the indictment and the proof. The State responds that Officer Curtis' testimony did not create a variance between the indicted conduct and the proof, noting that Officer Curtis testified that a drug mule usually received payment upon delivery of the narcotics, which would constitute a sale. We agree with the State.

During redirect examination, the State asked if Officer Curtis had "ever heard the term drug mule," and Officer Curtis responded that he had. Defense counsel objected, arguing that the "line of questioning is going into distribute" and that the Appellant was charged with possession with intent to sell, not possession with intent to distribute. The State responded that "any time a drug mule distributes, they go from one dealer to the next.

. . . And he don't work for free. They get paid upon delivery. . . . That is resale." The trial court agreed to give the State "a little leeway."

Officer Curtis explained that a "drug mule" was a "middle man" who transported narcotics from a "high level supplier" to a "street level dealer." Therefore, as the middle man, the Appellant did not need to divide the drugs into different plastic baggies because he would be paid upon delivery, which would "constitute a resale of that product." Officer Curtis surmised that the Appellant's lack of cash indicated that he had not yet been paid because the "altercation" at the Quality Inn had interfered with his ability to "drop . . . the dope off."

On recross-examination, Officer Curtis acknowledged that the Appellant could have spent all of his money to buy the methamphetamine. Officer Curtis further acknowledged that the police found no evidence of drug trafficking on the Appellant's cellular telephone. On further redirect-examination, Officer Curtis said that from his training and experience, drug mules and their suppliers usually communicated "face-to-face" instead of cellular telephones because "[t]hey don't want anything that can be traced back to the supplier."

At the conclusion of Officer Curtis' testimony, defense counsel moved for a mistrial "[a]s a result of the objection that [the] defense made on the line of questioning about a middle man, and a mule going to an element of an offense that is not accused in the indictment." Defense counsel argued that the proof related to possession of methamphetamine with the intent to deliver, not the indicted offense of possession of methamphetamine with the intent to sell, and that the jury would "not be able to let go of that." The State responded that the officer's testimony reflected that "a drug mule does [resell] his product." The trial court found that Officer Curtis' testimony helped explain why the Appellant had such a large amount of drugs but did not have drug paraphernalia such as baggies or scales in his possession. The trial court explained that if the Appellant were "a middle man in the truest sense of the word, if he's taking it to someone else[,] it is being resold to someone and money would exchange. I know of no case law that says differently." Accordingly, the trial court denied the motion for mistrial. The Appellant challenges this ruling.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (citing State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)).

Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

The indictment charged the Appellant with possession of .5 grams or more of methamphetamine with the intent to sell. A "[s]ale" has been defined as "a bargained for, offer and acceptance and an actual or constructive transfer or delivery of the substance." State v. Holston, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). "One who accepts payment in exchange for property is involved in a sale." Id. at 511 (citations omitted). The Appellant contends that Officer Curtis' testimony related to the possession of drugs with the intent to deliver. Tennessee Code Annotated section 39-17-402(6) provides that "'[d]eliver' or 'delivery' means the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship[.]"

The Appellant's complaints regarding whether a variance existed between the proof and the indictment are without merit. "A variance between an indictment . . . and the evidence presented at trial is not fatal unless it is both material and prejudicial." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000); see also State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). A variance is not material when substantial correspondence exists between the proof and the indictment. See Shropshire, 45 S.W.3d 71. As the trial court found, nothing in Officer Curtis' disputed testimony constituted a material variance from the indictment. Officer Curtis' testimony supported the State's theory of why the Appellant had such a large amount of methamphetamine but did not have any baggies, scales, or cash. His testimony also explained that as the middle man, the Appellant would receive the money for the drugs from the buyer. The Appellant failed to meet his burden of establishing the necessity of a mistrial.

D. Closing Argument

Finally, the Appellant contends that the trial court erred when it allowed the State to "vouch against" the Appellant's credibility in its closing arguments. However, the Appellant acknowledges that he did not object to the State's closing arguments. Generally, a defendant's failure "to proffer contemporaneous objections to the challenged remarks" waives the issue on appeal. State v. Robinson, 146 S.W.3d 469, 518 (Tenn. 2004); see Tenn. R. App. P. 36(a). Nevertheless, the Appellant requests that we review the issue for plain error. Tenn. R. App. P. 36(b); see State v. Hawkins, 519 S.W.3d 1, 49 (Tenn. 2017); Adkisson, 899 S.W.2d at 641-42; Smith, 24 S.W.3d at 283.

The Appellant specifically complains about the following statements made during the State's closing arguments:

You should not believe [the Appellant]. He has given you multiple reasons not to believe him.

. . . .

[The Appellant] tells you that it was his ex-girlfriend who he won't identify that was trying to break in to his hotel room. But when the police went out there that night his story to them was, "I don't know who it was. Here's a description of what they look like." The officer testifies that he described one of them as a male. You did not hear that coming out of [the Appellant's] mouth today. He is deceiving you.

During the State's rebuttal closing argument, the State said, "[The Appellant] may be addicted to a lot of things or a few things, but for sure the truth ain't one of them." The State also said, "I mean, we've got him charged with possessing to sale [sic] meth, and here he is trying to sell you this ridiculous story that he's got this much meth for personal use when it makes no sense at all."

Regarding prosecutorial misconduct during closing arguments, it is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

We note that the record clearly established what occurred in the trial court and that nothing suggests the Appellant waived the issue for tactical reasons. Generally, "a lawyer should not assert his or her personal opinion as to the credibility of a witness, or as to the accused's guilt or innocence." State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App.

- 13 -

1999) (citing State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989)). This court has stated that "it is rarely to the benefit or to the dignity of the state to characterize the defendant as 'a liar,' even if the proof supports such a conclusion"; however, the State "has every right to question the veracity of the defendant's claims so long as it is in conjunction with evidence appearing in the record and the reasonable inferences which might be drawn therefrom." State v. Jody Sweat, No. E2000-02472-CCA-R3-CD, 2001 WL 1134604, at *9 (Tenn. Crim. App. at Knoxville, Sept. 26, 2001).

In the instant case, the State's remarks clearly were questioning the veracity of the Appellant's claims. While the State's comments could have been more artfully made, they did not prejudice the jury against the Appellant. Accordingly, we conclude that the Appellant is not entitled to plain error relief on this basis.

### E. Motion for New Trial

The Appellant contends that the trial court erred in denying his motion for new trial after he presented newly discovered evidence which contradicted a portion of Officer Curtis' testimony. The Appellant asserts that the newly discovered evidence was material and likely to change the outcome of the trial.

At the hearing on the motion for new trial, defense counsel submitted an affidavit with accompanying records from Nikki Dugger of the Johnson City Police Department. The records, which defense counsel referred to as a "crimemapping" analysis, reflected that during the time period of January 1, 2018, through March 5, 2018, four reports of drug activity near the Quality Inn were received. The "crimemapping" analysis revealed no drug arrests were made at the Quality Inn during the two months prior to March 4, 2018. The Appellant contended that the "crimemapping" analysis was unavailable to the defense during trial. The State conceded that the "crimemapping" analysis "constitute[d] new evidence that was not admitted during the trial."

In response to the defense's evidence, the State called Sergeant Jeff Legault with the Johnson City Police Department's narcotics unit. Sergeant Legault testified that in March 2018, he was an investigator with the narcotics unit. In his role as an investigator, Sergeant Legault was familiar with the Quality Inn because of information from informants and "general knowledge that there's a lot of drug activity that goes on there." He said that "like some other local hotels around there, it just – it's kind of a mainstay for people to come in and deal out of hotel rooms." Sergeant Legault had been to the Quality Inn "several times to observe, to watch to see what's going on." He explained that occasionally, tips led the police to watch certain rooms or certain cars at the motel. On other occasions, Sergeant Legault surveilled the motel because he knew drug activity was taking place there. He stated that it was "common practice" for the police to go to the Quality Inn several times a day to, at a minimum, perform extra patrols through the parking

lot for "crime, high crime, drugs, . . . robberies . . . , [and] overdoses . . . ." Sergeant Legault said that each day, a daily activity log was sent to all officers via email which would reflect "if someone's been checked at the Quality Inn, if there's been an arrest at the Quality Inn, if there's been a report taken at the Quality Inn."

On cross-examination, Sergeant Legault acknowledged that he had not brought to court any specific surveillance reports regarding the Quality Inn during March 2018 or the ninety days leading up to March 4, 2018, because the prosecutor "said not to worry about it." Sergeant Legault had no recollection of any specific activity that occurred at the Quality Inn during that time frame. However, he recalled that he had "bought quite a bit of narcotics from the Quality Inn" based upon informants' tips. He explained that "[a] drug investigation doesn't necessarily lead to one arrest. We do an investigation just like everybody else. There's going to be several cases, several buys, several other things so not necessarily right at that time would there be a report." He said, "I don't know the dates but I can say I have purchased narcotics from the Quality Inn." Sergeant Legault said that the police made a report if an arrest was made but not for just an extra patrol.

The trial court found that the evidence had some materiality as far as Officer Curtis' credibility, specifically concerning his testimony about the Quality Inn being a high crime area. The trial court stated that Officer Curtis' demeanor at trial had been "flippant" and that he had a "poor attitude," noting that the officer had a pair of sunglasses pushed on top of his head and that he had chewed gum during his testimony until he was instructed to discard it. The trial court stated that defense counsel had thoroughly and effectively cross-examined Officer Curtis. Although the trial court was "not overly impressed with [Officer Curtis'] demeanor and his actions in the courtroom," the court said, "[N]othing that I've seen, nor does the new evidence cause me to question the credibility as to what happened that night."

The decision to grant or deny a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial court. State v. Goswick, 656 S.W.2d 355, 358 (Tenn. 1983); State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). The trial court's exercise of its discretion is dependent upon (1) whether the defendant was reasonably diligent in attempting to discover the evidence; (2) whether the newly discovered evidence is material; and (3) whether the evidence would likely have changed the result of the trial. State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (appendix); State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993). Generally, "[a] new trial will not be granted on newly discovered evidence where it appears that such new evidence can have no other effect than to discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness . . . ." State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985). However, this general rule will yield if the impeaching evidence "is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal." Singleton, 853 S.W.2d at 496. Obviously, when a verdict is already one

of questionable validity, even newly discovered evidence of relatively minor importance may be sufficient to create the requisite probability of acquittal.  Id.

Our review reveals that the State conceded that the newly discovered evidence was not available to the Appellant at the time of trial.  We question this concession, noting that the information was only a compilation of reported crimes which occurred prior to the instant offense.  Nevertheless, even assuming that the Appellant was reasonably diligent in obtaining the evidence and that the materiality of the new evidence was apparent, we, like the trial court, conclude that the evidence was not likely to change the result at trial.

At trial, the following colloquy occurred:

> [The State:]  Is the Quality Inn Hotel a high drug trafficking area?
>
> [Officer Curtis:]  Absolutely.
>
> [The State:]  How often are you out there in regards to drug activity, narcotics activity?
>
> [Officer Curtis:]  There's times we could be out there every night.  Every night we worked.

The Appellant contends that because the evidence reflects that no drug arrests occurred at the Quality Inn in the ninety-day period prior to the Appellant's arrest and that the police did not make any reports regarding drug activity, the evidence thereby contradicts Officer Curtis' testimony.  We note, however, that Officer Curtis did not testify that the police made any arrests during the specific time frame.  Further, Sergeant Legault testified at the motion for new trial hearing that the police often patrolled around the Quality Inn during that time frame because of crime, including drug activity, but that the police did not make reports regarding patrols.  Therefore, the evidence did not contradict Officer Curtis' testimony.  We agree with the trial court that the evidence did not warrant relief.

### III.  Conclusion

We affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 16 -